IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| Joseph Solomon Mizerany, IV, | ) | Case No.: 07-01571-BGC-7 |
| Debtor. | ) | |
| First Commercial Bank, | ) | |
| Plaintiff, | ) | |
| vs. | ) | A. P. No.: 07-00148-BGC |
| Joseph Solomon Mizerany, IV, | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION ON COMPLAINT
TO DETERMINE DISCHARGEABILITY**

The matter before the Court is the Complaint for Nondischargeability filed by First Commercial Bank on July 2, 2007. A.P. Docket No. 1. After notice, a trial was held on November 14, 2012. Appearing were Mr. Joseph Solomon Mizerany, IV, the defendant-debtor; his attorney, Mr. Ray A. Carle; and Mr. Jay H. Clark, the plaintiff's attorney.

The matter was submitted on: the testimony of Mr. Mizerany, Mr. Joseph Fountain, a former employee of the plaintiff, and Ms. Rebecca Burbank, a current employee of the plaintiff; admitted exhibits; the record in this case; and arguments and briefs of counsel.

As discussed below, the Court finds that the debt owed by the defendant to the plaintiff is dischargeable, and therefore the relief requested in the complaint is due to be denied.

### I. Findings of Fact

#### A. General Facts Concerning Nine Draws
#### Against a Letter of Credit

Between May 30, 2006, and August 30, 2006, the defendant borrowed $454,851.29 from the bank on a $544,000 closed-end line of credit for the purpose of

renovating a house at 1810 Mayfair in Homewood, Alabama. Repayment of the amounts advanced to the defendant on the line of credit was secured by a mortgage on the house to be renovated and real property on which it sat. The defendant's intent was to resell the property, once renovated, at a profit.

The defendant received the money from the bank in nine separate draws: $289,451.81 on May 30, 2006; $65,000 on May 31, 2006; $10,000 on June 5, 2006; $25,000 on June 9, 2006; $25,000 on June 16, 2006; $15,000 on June 23, 2006; $10,000 on July 14, 2006; $8,748.43 on August 22, 2006; and $6,651.05 on August 30, 2006.

Paragraph 4 of the "Construction Loan Agreement" executed by the defendant in connection with the loan required him to seek and obtain approval from a bank representative before any advance would be extended. Plaintiff's Exhibit 6.

Paragraph 2 of the "Construction Loan Agreement" required the defendant to use any advance so obtained to complete the purported purpose for which the loan was obtained and extended, which was to renovate the 1810 Mayfair property. The Agreement read:

> Owner agrees to apply the net proceeds of the loan, meaning the gross loan proceeds minus closing costs and financing costs that are financed as part of the loan, to the cost of the improvements described above and to construct the improvements according to the plans and specifications and according to the construction budget that has been submitted to the lender and are hereby made a part of this agreement by reference.

Plaintiff's Exhibit 6.

The loan officer at the bank who was responsible for approving the amounts requested and provided to the defendant under the line of credit was Mr. Joe Fountain. Mr. Fountain testified that a pivotal factor in deciding to extend the line of credit was the longstanding and theretofore successful relationship between the defendant and the bank and the trust inherent in that longstanding and successful relationship. In fact, the defendant had received 12 to 15 loans previously from the bank and had several other renovation projects going, with funds loaned by the bank, contiguously with the 1810 Mayfair project. Furthermore, according to Mr. Fountain, the defendant had, at the time the line of credit for 1810 Mayfair was approved, adequate income and the financial wherewithal to justify his receipt of that loan. Moreover, the defendant had not defaulted on any of the 12 to 15 loans that had previously been extended to him by the bank. Nor had any negative issues arisen in connection with any of his previous loans, and there was nothing in his credit history which indicated that he would have trouble paying back the amounts lent to him on the 1810 Mayfair line of credit.

Prior to approving the loan, the bank obtained an appraisal of the projected value of the house, post-completion of the improvements planned by the defendant, based on the construction drawings submitted by the defendant with his loan request (Plaintiff's Exhibit 8). The amount to be loaned represented eighty percent of the planned after completion improvements appraised value.

Based on the defendant's longstanding, and, up to that point, mutually beneficial relationship with the bank, and his financial ability to stand good for the loan, and the appraisal, Mr. Fountain recommended approval of the line of credit.

### B. Three Uncontested Draws

The first draw of $289,451.81 taken on May 30, 2006, was, with the bank's approval and authorization, used to pay off the balance owed on the purchase money loan previously obtained by the defendant from the bank in 2005 to purchase the 1810 Mayfair property, plus approximately $3,800 in loan closing costs. Plaintiff's Exhibit 9. The bank does not contend that the part of the debt owed by the defendant which is represented by that draw is nondischargeable. In fact, it could not as the bank specifically authorized the defendant to use those funds in that manner.

The August 22, 2006, draw of $8,748.43 and the August 30, 2006, draw of $6,651.05 were, with the bank's approval, knowledge, and authorization, used to make payments on either the 1810 Mayfair loan or one or more the other construction loans then owed by the defendant to the bank. In fact, the bank never paid that money directly to the defendant but instead applied it directly to those loan payments. The bank does not contend that the part of the debt owed by the defendant which is represented by those draws is nondischargeable. Again, it could not because it specifically authorized the defendant to use those draws to make those loan payments. In fact, it was the bank, rather than the defendant, that performed the electronic transaction which resulted in those funds being applied to make the defendant's loan payments rather than the funds being provided directly to the defendant for his use in making the improvements on the 1810 Mayfair property.

### C. Six Contested Draws

The bank contends that the <u>remaining six draws totaling $150,000</u> were obtained fraudulently. More specifically, its theory is that while the defendant promised in paragraph 2 of the construction agreement, quoted above, that he would use the funds advanced by the bank only to complete the project, he did not use the funds in that manner and did not intend to honor that promise when he sought and obtained those advances from the bank.

Indeed, it is apparent from the defendant's testimony and bank records that he did not use the contested loaned funds either to have work performed on 1810 Mayfair or to purchase materials to be used to improve that property. According to him, before

3

the planned renovations, the house consisted of approximately 2100 square feet with two bedrooms, two bathrooms, a kitchen, a living room, a den and a dining room on the first floor, and one bedroom, one bathroom, and a closet on the second floor. The planned renovations called for making the front porch bigger; improving an existing sunroom; moving an outside staircase from one side of the house to the other; adding a master bedroom to the first floor; adding two new bedrooms to the second floor; enlarging the second floor bathroom and adding an additional second floor bathroom; and moving the staircase which led from the first floor to the second floor.

Pre-renovation, the second floor of the house measured 400 square feet. Had the planned renovations taken place, the size of the second floor would have increased to 1950 square feet, and the size of the first floor, which pre-renovation measured around 1800 square feet, would have been increased to around 2300 square feet. In essence, the size of the house would have been doubled; however, the defendant admitted that, prior to the draws being halted by the bank on August 30, 2006, he had done nothing toward making those planned renovations other than renting a dumpster and having a bit of siding removed from the back of the existing structure.

When asked to identify what expenditures he had made in furtherance of making the planned renovations on the 1810 Mayfair property, the defendant stated that he rented a dumpster but admitted that the dumpster was shared with several other projects so that the entire cost of the dumpster rental could not be attributed to the 1810 Mayfair project. He said that he had some siding removed from the back of the house but could not say how much he spent to have that work done or identify any cancelled checks purportedly used to pay for that work. He said that he obtained blueprints and paid an architect approximately $1,500 to $2,500 for them, but he could not produce either the blueprints or the cancelled check used to make that alleged payment. Moreover, he appeared to contradict himself in another part of his testimony when he stated that he was still waiting on the plans from the architect to begin construction when the bank stopped the draws. He estimated that he probably spent around $1,500 on the permits and fees which were required to begin construction but could not identify any cancelled checks purportedly used to make those expenditures.

The bank terminated the line of credit on August 30, 2006, because, according to Mr. Fountain, he had been unable to contact or communicate with the defendant. At that point, $100,000 of the line of credit had not been advanced. Ultimately, the defendant defaulted on the loan. The bank foreclosed its mortgage and purchased the property at its own foreclosure sale on March 30, 2007, for a $325,000 credit on the defendant's debt, which, at the time, stood at $473,420.81.

Problematic to all of the bank's theories of liability is the fact that Mr. Fountain, on its behalf, approved each of the draws obtained by the defendant. The pivotal question then is whether Mr. Fountain, with respect to any of the draws that he approved, knew that the defendant was not going to use the funds being advanced to renovate the 1810 Mayfair property.

4

## 1. The Contested $65,000 Equity Draw

The defendant purchased the property for $357,000. Of that amount, he funded $57,000 personally and borrowed $300,000 from the bank. When he paid off the balance of the purchase money loan, it was $289,451.81 leaving, according to him, about $67,500 in equity which he had accumulated in the property. The defendant testified that Mr. Fountain and the latter's supervisor at the bank, Mr. Fred Lindsey, both agreed that he could recoup that equity from the loan proceeds. He claims that the $65,000 draw that he received from the bank on May 31, 2006, was authorized as a result of that agreement. Pertinent testimony reads:

> Q. The second draw that you had there on May 31, 2006, one day after this loan was started for sixty-five thousand, did you have any conversations with Joe Fountain and/or Fred Lindsey in regards to that draw, what you could do with that money?
> A. No discussion in regards to how that money needed to be handled. That was never questioned.
> Q. Did you have any discussions with them as far as getting your equity back out of the house?
> A. I did, and that is the reason that that draw is there.
> Q. So that draw represents –
> A. The equity that I had put in originally when I purchased the house originally.
> Q. At this time do you know approximately how much equity you had in the house?
> A. I don't.
> Q. Was it more or less than that sixty-five thousand?
> A. It was more than sixty-five thousand.
> Q. Who okayed that?
> A. Joe and Fred Lindsey. Joe Fountain and Fred Lindsey.
> Q. They both okayed you taking that sixty-five thousand dollars worth of equity back out?
> A. They did.
> Q. And did you specifically ask Joe or Fred Lindsey, or both of them, whether you could do that?
> A. I did. We had that discussion.
> Q. And what did they say?
> A. They said that that shouldn't be a problem.
> .....
> Q. Well, let's start again with that May 31, 2006, draw for sixty-five thousand.
> A. Okay.
> Q. Tell us what that draw was for.
> A. That draw for sixty-five thousand was the equity that I had initially put in the property.

5

| | Q. | And who agreed and authorized that draw? |
| | A. | Joe Fountain. |
| | Q. | And did he know you were withdrawing your equity? |
| | A. | Yes. |
| | Q. | Did Mr. Lindsey know? |
| | A. | Yes. |
| | Q. | Did either one of them ever express to you a problem with taking that equity out? |
| | A. | Not at all. |
| | .... | |
| | Q. | Now let's talk about that again, that Plaintiff's Exhibit 9, the May 31, 2006, draw for sixty-five thousand dollars. What did that draw represent? |
| | A. | After talking to Fred – Fred Lindsey and Joe Fountain, we discussed it and we all agreed that they had no problems with me pulling my equity that I had put into the property to purchase it originally back out. |

Trial Transcript, pages 198-199, 204, and 324.

    Two anomalies detract from the credibility of the defendant's testimony. First, Mr. Fountain testified that it was important to the bank, in making the decision to extend the loan, that there be equity in the completed project. It is therefore difficult for the Court to understand why the bank would approve the loan then relinquish the property's equity for no apparent reason. Moreover, the defendant, when asked in his deposition about the draws he had taken, never mentioned either the conversation with Fountain and Lindsey about recouping his equity or having taken a draw for the purpose of recouping his equity in the property. It is difficult to perceive how he could have forgotten something of such monumental importance on one occasion, despite being extensively questioned on the subject of what the various draws were used for, but then remembering it so vividly on a subsequent occasion.

    Nevertheless, those anomalies in themselves supply insufficient grounds for completely disregarding the defendant's testimony especially since Mr. Fountain was unable to deny that the conversation occurred between the defendant and Mr. Lindsey in which Mr. Lindsey authorized the debtor to take the draw that permitted him to obtain the equity in the property. While Mr. Fountain could not recall any such conversation having taken place, he could not deny that it did, and admitted to the possibility that it may have. He testified:

| | Q. | Did Mr. Mizerany ever ask you if he could use his line of credit to repay himself for equity he felt he had in the Mayfair project? |
| | A. | I don't recall if he did. |
| | ... | |

6

> Q. Now didn't you have a meeting with Mr. Fountain and Mr. Lindsey in which you said that you both B you and Mr. Lindsey agreed that Mr. Mizerany could draw his equity out in that first draw?
> A. I don't recall that meeting.
> Q. So that sixty-five thousand dollar draw, if Mr. Mizerany was to testify that that was agreed upon by you and Mr. Lindsey that he could draw that equity back out, you can't recall anything about that?
> A. I don't recall that meeting.
> Q. So it could have happened?
> A. It could have.

Trial Transcript, pages 45 and 68-69.

The bank had the burden to prove by a preponderance of the evidence that the defendant promised to use the $65,000 that he was advanced on May 31, 2006, to pay for improvements on the 1810 Mayfair property. The only evidence on the subject consisted entirely of the testimony of the defendant and Mr. Fountain.

The defendant's unrefuted testimony, albeit somewhat anomalous, constitutes proof that he did not represent to the bank that he intended to use those funds to improve the property; that the bank knew fully well that he did not intend to use those funds to improve the property; and that the bank consented to his use of those funds in a manner otherwise prohibited by the construction agreement.

Mr. Fountain's testimony does not support a contrary conclusion. In fact, his candid admission that the meeting described by the defendant could have in fact taken place adds credence to the defendant's testimony. Similarly, the amount of the draw closely approximated the equity that, according to Mr. Fountain, the defendant had in the property at the time, the inference is bolstered that the draw was intended, by both the bank's representatives and the defendant, to return the equity to the defendant. In addition, that testimony supports the inference that the defendant was not restricted in using those funds in the manner described in the construction agreement.

Mr. Fountain also testified that the bank's losses associated with the construction loan made to the defendant resulted in termination of his employment with the bank. More importantly, he said that his giving the defendant permission to use the loan proceeds in the manner in which he did factored in that decision by the bank. He testified:

> Q. How did your employment at First Commercial end?
> A. I was asked to resign.
> Q. Why?
> A. Because of the losses taken on Mr. Mizerany's account, as well as others.

7

> Q. Did it have anything to do with you authorizing Mr. Mizerany to use these loan proceeds like he did?
> A. It was a factor, yes.

Trial Transcript, page 105.

That statement constitutes, on its face, an admission by Mr. Fountain that he in fact authorized the defendant to use the loan proceeds as he did.

Moreover, Mr. Fountain said that he and the defendant were "friends" during the life span of the loan involved in this case. Trial Transcript, page 106. It is very difficult to believe that Mr. Fountain, as a very experienced lending officer, would not remember with particularity the details of such a pivotal event in his life. This must be additionally true especially because the defendant's alleged malfeasance involved, according to Mr. Fountain, an extreme deviation from paragraph 2 of the construction agreement.

Based on the above, the Court concludes that the bank failed to prove, by a preponderance of the evidence; (1) that it advanced the $65,000 to the defendant on May 31, 2006, based on any misrepresentation, explicit, implicit or otherwise, made by the defendant; (2) that the defendant made any such misrepresentation for the purpose of obtaining that money; or (3) that he used that money in a manner not authorized or consented to by the bank. The bank, by way of its agents and employees, was free to permit the defendant to disregard Paragraph 2 of the "Construction Loan Agreement" and the proof reflects that, more probably than not, that is exactly what it did with respect to the May 31, 2006 draw.

## 2. The Five Remaining Contested Draws

The remaining $85,000 in draws are: (1) $10,000 on June 5, 2006; (2) $25,000 on June 9, 2006; (3) $25,000 on June 16, 2006; (4) $15,000 on June 23, 2006; and (5) $10,000 on July 14, 2006.

The defendant admitted, and his checking account records reflect, that he used only an insignificant portion of those draws on the 1810 Mayfair project. The remainder of those funds, according to his explicit admission, were used by him to make interest payments on the other loans he owed to the bank and to perform work on his other construction projects. In addition to 1810 Mayfair, the defendant had two other loans with the bank which he secured to renovate other properties. From May through August 2006, the defendant made payments totaling roughly $20,000 on the three loans, according to Ms. Rebecca Burbank, another of the bank's representative.

Mr. Fountain could not deny that the defendant told him that the draws would be used in the manner that he used them. When asked if the defendant told him that the funds would be used to pay interest on the other loans he owed to the bank, Mr. Fountain admitted that he may have. He testified:

8

> Q. Is it possible in these other loans that Mr. Mizerany called you up and told you that he needed that money to pay other interest payments?
> A. Is it possible; is that your question?
> Q. Yes.
> A. I don't recall having those conversations with him.
> Q. So it is possible that he could have called you and said I need to make this draw because I have to make my other interest payments and I don't have the funds right now?
> A. It is possible.

Trial Transcript, page 76.

The strength of that possibility is bolstered by two additional facts. First, Mr. Fountain stated that he specifically authorized the defendant to take two draws on the 1810 Mayfair loan, on August 22, 2006 and August 30, 2006, for the sole purpose of making payments on the several loans he owed to the bank. It is reasonable to conclude, therefore, that Mr. Fountain may have given his permission for the defendant to use other proceeds from the 1810 Mayfair loan to make payments on the several loans he owed to the bank, especially given that the former cannot now remember whether he gave that permission or not. Second, Mr. Fountain admitted that the bank permitted other borrowers to take draws from one loan to pay interest on other loans which they owed to the bank. He testified:

> Q. Did you let any other construction loan borrowers use their loan proceeds outside of the loan agreement?
> A. For interest payments, yes.
> Q. Mr. Lindsey did that, too?
> A. I think he did.

Trial Transcript, page 104.

That admission likewise supports the conclusion that Mr. Fountain may have granted the defendant permission to use part of the 1810 Mayfair loan proceeds to make loan payments to the bank in addition to those used to make loan payments on August 22 and August 30.

Mr. Fountain also admitted that the defendant may have informed him that he was going to use proceeds from the Mayfair loan to perform work on his other projects. He testified:

> Q. You said you don't recall if Joey or Mr. Mizerany ever told you that the funds he was requesting from this loan were used on other projects; is that correct?
> A. I don't recall.

9

> Q. You don't recall if he ever did that?
> A. I don't recall him telling me that, no.
> Q. Well, is it possible that he did tell you that since you don't recall?
> A. Yes.

Trial Transcript, page 67.

That admission precludes the conclusion that its is more likely than not that the defendant's use of the 1810 Mayfair loan proceeds to finish or pay for work done on the other projects was not authorized by the bank or done without the bank's knowledge and acquiescence.

Mr. Fountain also admitted, despite having numerous conversations with the defendant regarding the latter's several projects, that he could not recall whether or not the defendant told him how he was using the proceeds of the 1810 Mayfair loan. He testified:

> Q. You had a lot of conversations with Mr. Mizerany; did you not, in regards to his projects?
> A. We talked a lot, yes.
> Q. And you had a lot of conversations about this project; didn't you?
> A. I would assume.
> Q. And Mr. Mizerany told you exactly how he was using the loan proceeds; isn't that true?
> A. I don't recall.

Trial Transcript, page 104.

In fact, Mr. Fountain included "don't recall" in response to almost every question about whether the defendant had informed him how the loan proceeds would be or were being used, which denial of recollection is accurately and succinctly summarized in the following exchange:

> Q. So what we have come to right now is you don't recall having a meeting with Mr. Lindsey and Mr. Fountain; you don't recall talking to him about whether this thirty-two thousand was applied on the house or not and you don't recall whether any of these other draws, these five other draws, Mr. Mizerany told you that he was going to pay interest payments or use it for stuff outside of this construction project; is that a correct summary?
> A. That is.

Trial Transcript, page 98.

10

Case 07-01571-TBB7    Doc 192    Filed 03/06/14    Entered 03/06/14 14:42:28    Desc Main
Document    Page 10 of 18

Those admissions further support the conclusion that the defendant's use of the 1810 Mayfair loan proceeds in the manner in which he used them was, more probably than not, done with both the bank's knowledge, <u>via</u> Mr. Fountain, and with the bank's permission, <u>via</u> Mr. Fountain. Moreover, they preclude the conclusion, advanced by the bank, that the defendant's use of the loan proceeds in the manner in which he used them was more likely than not done without its knowledge and consent. And at the very minimum, they fail to support, and provide no proof of the latter theory.

<u>A fortiori</u>, as indicated before, Mr. Fountain admitted that the termination of his employment at the bank resulted in part from his permitting the defendant to use proceeds of the 1810 Mayfair loan in the manner in which he used them, which would include, of course, his use of the funds to make loan payments and to pay for work done on other projects. That admission goes beyond Mr. Fountain's admission that he may have given his permission for the defendant to take his equity out of the 1810 Mayfair property in the form of a draw, and to use proceeds of the 1810 Mayfair loan to make loan payments other than those made on August 22 and 30, and to use them to pay for work on other projects. It represents, on its face, a full and unqualified confession that whatever the defendant did with the 1810 Mayfair loan proceeds was fully authorized by him on behalf of the bank.

The conclusion that the bank, more probably than not, knew and acquiesced in the defendant's use of the 1810 Mayfair loan proceeds in a manner inconsistent with paragraph 2 of the construction agreement is further bolstered by the course of dealing between the defendant and the bank during their extensive relationship, as described by the defendant in his essentially unrefuted testimony on the subject:

> Q. Let's talk about your course of dealings with the bank. What was your understanding as far as how you were allowed to use these construction loan proceeds?
> A. My understanding was that, you know, I would need to take the money and use it towards the project but there were times often that other projects we would commingle.
> Q. Did you ever discuss with Joe Fountain or Fred Lindsey using any proceeds for payments of loan interest payments?
> A. Yes.
> Q. And did you ever have any discussions with either Joe Fountain or Fred Lindsey about using some of these proceeds to pay some bills on other projects?
> A. I am sure we had talked about it. You know, I am always trying to keep them up-to-date on everything going on.
> .....
>
> Q. Mr. Mizerany, do you recall that the construction loan agreement placed limitations on how you could use the funds, correct?

11

> A. No. I mean, I didn't recall exactly how they were laid out. I have never actually read the agreement but, based on previous dealings, I have been able to use money from one project to finish another, sell it and then take that money and put it back into the other project, get it completed and so on and so forth.
>
> .....
>
> Q. Let's talk a little bit about your dealings with the bank on all of your loans. Did you handle this loan any differently than you handled any other construction loan at the bank?
> A. No.
> Q. And did you pay off those previous construction loans?
> A. Yes.

Trial Transcript, pages 210-211, 232-233, 325.

According to that description, the bank trusted the defendant to use the proceeds of his several loans within the realm of the several projects he had going at any one time. Given the defendant's successful track record of completing projects and paying off loans owed to the bank, ordinarily the bank did not require him to limit his spending of the proceeds of a particular loan to the particular project that the funds were loaned to improve as long as the defendant was either returning the money to the bank in the form of payments on any of his several loans or spending the money to improve any of the properties on which the bank held a mortgage.

Like its factual conclusions regarding the defendant's $65,000 equity draw, the Court concludes that the bank failed to prove, by a preponderance of the evidence; (1) that it advanced the remaining five contested draws based on any misrepresentation, explicit, implicit or otherwise, made by the defendant; (2) that the defendant made any such misrepresentation for the purpose of obtaining that money; or (3) that he used that money in a manner not authorized or consented to by the bank. The bank, by way of its agents and employees, was free to permit the defendant to disregard Paragraph 2 of the "Construction Loan Agreement" and the proof reflects that, more probably than not, that is exactly what it did with respect to the remaining five draws.

## II. Conclusions of Law

The plaintiff's <u>Complaint for Nondischargeability</u> contends that whatever debts the defendant owes to it are not dischargeable because of: (1) fraud pursuant to section 523(a)(2)(A); (B) willful and malicious injury pursuant to section 523(a)(6); or (C) embezzlement pursuant to section 523(a)(4). Each allegation is discussed below.

## A. 523(a)(2)(A) Fraud

The bank contends that the debt owed to it by the defendant is nondischargeable pursuant to section 523(a)(2)(A) of the Bankruptcy Code, which makes nondischargeable debts for, "money, property, services or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition ...." 11 U.S.C. § 523(a)(2)(A). To have a debt declared nondischargeable pursuant to 523(a)(2)(A), a creditor must prove, "the debtor made a false statement with the purpose and intention of deceiving the creditor; the creditor relied on such false statement; the creditor's reliance on the false statement was justifiably founded; and the creditor sustained damage as a result of the false statement." Fuller v. Johannessen (In re Johannessen), 76 F.3d 347, 350 (11th Cir. 1996).

In order to state a cause of action based on a promise to do or abstain from doing something in the future, a plaintiff must allege that the defendant made the promise with the intent to deceive the plaintiff and, that at the time he made the false promise, the defendant intended not to honor it. Ex parte Moulton, 116 So.3d 1119, 1144 (Ala. 2013). Hence, "Where the alleged fraud is 'predicated upon a promise, it is essential that the [pleader allege that the] promisor intended not to perform at the time of making the promise.' " Bethel v. Thorn, 757 So.2d 1154, 1158 (Ala. 1999) (quoting Robinson v. Allstate Ins. Co., 399 So.2d 288, 290 (Ala. 1981) (parenthetical in original).

A cause of action for promissory fraud, however, cannot, as a matter of law, be based on nonperformance alone. " '[F]ailure to perform alone is not sufficient evidence to show a present intent not to perform. If it were, then every breach of contract would be "tantamount to fraud." ' " Heisz v. Galt Industries, Inc., 93 So.3d 918, 925-926 (Ala. 2012)(quoting Gadsden Paper & Supply Co. v. Washburn, 554 So.2d 983, 987 (Ala. 1989)(citing and quoting Purcell Co. v. Spriggs Enters., Inc., 431 So.2d 515, 519 (Ala.1983)).

The alleged misrepresentation the bank relies on in this proceeding lies in paragraph 2 of the "Construction Loan Agreement" (Plaintiff's Exhibit 6) in which the defendant agreed to use the funds advanced to him solely to renovate the 1810 Mayfair property. The agreement, however, required the defendant to justify each draw individually before receiving it, and the agreement authorized the bank to refuse or permit any such draw based on the justification then given for the same by the defendant. Paragraph 2 was for the bank's benefit and protection. The bank was free to disregard that provision or to permit the defendant to deviate from it in its sole discretion. Each draw stood on its own and the bank could elect, before permitting any such draw, either to hold the defendant strictly to the confines of paragraph 2 or to release him from the requirement of that paragraph and allow him to use the funds advanced for purposes other than renovating the 1810 Mayfair property. It admitted that it did so with respect to the initial draw, which the defendant used, with the bank's permission, to pay off the amount owed on the previous loan secured by the property,

13

and with respect to the August 22 and 30 draws which the bank used to make payments on the loans owed by the defendant to the bank.

Morever, the evidence reflects, with respect to the remaining draws, which the bank contends were fraudulently obtained, that, more probably than not, or that it is at least equally probable, that before obtaining each of those draws, the defendant told Mr. Fountain that they would not be used to renovate the 1810 Mayfair property, but instead would be used to: (1) reimburse the defendant for his equity in the property; (2) pay interest on the 1810 Mayfair loan as well as the other loans owed by the defendant; or (3) to complete the other construction projects that he was then also involved in.

Consequently, with respect to those advances or draws, the evidence does not indicate that the defendant misrepresented his intentions about how those funds would be used; or that the bank, (because Mr. Fountain had been informed by the defendant that the funds would not be used in accordance with paragraph 2 of the construction agreement), actually relied on that paragraph when it permitted those draws; or that the bank, (because Mr. Fountain had been informed by the defendant that the funds would not be used in accordance with paragraph 2 of the construction agreement), could have justifiably relied on that paragraph when it permitted those draws.

Furthermore, the evidence reveals that the defendant had other construction projects going simultaneously with the 1810 Mayfair property that were being financed by the bank, including two in his individual name and two under the auspices of corporations he was part of. It stands to reason that had the defendant intended to defraud the bank of its money he would not have returned funds to the bank in the form of interest payments on those loans or sunk it into improving properties which the bank held an security interest in. Therefore, to the extent he used the money he obtained from the bank to make interest payments to the bank and to improve property which the bank had a security interest in, the defendant's actions are inconsistent with and contrary to the intent to defraud or mislead that is necessary for a determination of nondischargeability pursuant to 523(a)(2)(A).

In addition, the record reflects that the defendant churned the funds he received from the bank into operating his business, that is, buying, renovating, and selling of houses, which the bank had a substantial financial interest in seeing succeed. Moreover, the defendant made substantial deposits into his business checking account from sources other than the 1810 Mayfair loan, which he likewise used in an effort to make his business succeed.

On the other hand, the record lacks evidence that the defendant used the funds from the 1810 Mayfair loan on personal indulgences, which is ordinarily a hallmark of fraudulent intent. Had he truly intended to defraud the bank out of its money, it is unlikely he would have used both the loan proceeds and his unrelated personal funds in a manner, as he did, that stood to benefit the bank. Had he been successful in maintaining his business productivity at its past levels, which according to the evidence

14

he should have absent a downturn in the real estate market, he would have been more than likely able to repay the loan and satisfy the bank. That mutually beneficial result is consistent with honest intentions and inconsistent with an intent to defraud.

Finally, according to Mr. Fountain, the defendant made all of the payments which came due on the 1810 Mayfair loan before the draws were stopped. In addition, he made two additional payments on the loan in September and December 2006 after the draws had been stopped. He also continued making the payments on his other two personal construction loans with the bank through December 2006. Such actions during the time period in which the bank contends the defendant was trying to defraud it, are likewise inconsistent with the actions of a person who intended to defraud the bank.

### B. 523(a)(6) Willful and Malicious Injury

The bank also contends that the debt resulting from the draws taken by the defendant on May 31, 2006; June 5, 2006; June 9, 2006; June 16, 2006; June 23, 2006; and July 14, 2006 are nondischargeable pursuant to 11 U.S.C. § 523(a)(6), which makes nondischargeable a debt for any "willful and malicious" injury caused by a debtor either to another person or that person's property. The definitions of those two particular terms of art have long been established and recognized in this circuit. Those are:

> We have held that proof of "willfulness" requires " 'a showing of an intentional or deliberate act, which is not done merely in reckless disregard of the rights of another.' " In re Walker, 48 F.3d 1161, 1163 (11th Cir. 1995)(quoting In re Ikner, 883 F.2d 986, 991 (11th Cir. 1989)). "[A] debtor is responsible for a 'willful' injury when he or she commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury." Id. at 1165; see also Kawaauhau v. Geiger, 523 U.S. 57, 61–62, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998)(holding that § 523(a)(6) requires the actor to intend the injury, not just the act that leads to the injury). Recklessly or negligently inflicted injuries are not excepted from discharge under § 523(a)(6). Kawaauhau, 523 U.S. at 64, 118 S.Ct. 974.
>
> "Malicious" means " 'wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will.' " In re Walker, 48 F.3d at 1164 (quoting In re Ikner, 883 F.2d at 991). To establish malice, "a showing of specific intent to harm another is not necessary." In re Ikner, 883 F.2d at 991.

Maxfield v. Jennings (In re Jennings), 670 F.3d 1329, 1334 (11th Cir. 2012).

The evidence does not support the allegation that the defendant, by using the loan proceeds in a manner inconsistent with paragraph 2 of the construction agreement, willfully or maliciously injured the bank. Rather, it reflects that, more probably than not, or at least that it is equally possible, that before obtaining each of the contested draws, the defendant fully informed the bank, <u>via</u> Mr. Fountain, that he was not going to use the funds thereby obtained to renovate the 1810 Mayfair property. In contrast, the defendant informed Mr. Fountain that he was going to use the funds to: (1) recoup his equity in the property; (2) pay interest on the 1810 Mayfair loan as well as the other loans that he owed to the bank; and (3) complete the other construction projects that he was then also involved in. In addition, the evidence supports the conclusion that the bank made the advances requested by the defendant with full knowledge of those uses, that is, that the defendant intended to use the funds contrary to the requirement of paragraph 2 of the construction agreement. Consequently, whatever injury befell the bank as a result of its approving the draws taken by the defendant resulted from its own deliberate actions, taken with full knowledge of the relevant circumstances, rather than from any malfeasance on the defendant's part.

Moreover, the bank's approval of the draws obtained by the defendant, with foreknowledge that the defendant intended to use the same for purposes other than that otherwise mandated by paragraph 2 of the construction agreement, provided him with ample "just cause" to use the funds in the manner in which he did, and, therefore, precludes the conclusion that his use of the loan proceeds was in any way "malicious," which, of course, is prerequisite for a determination of nondischargeability pursuant to 523(a)(6). In addition, by not denying the requested draws after learning that the defendant did not intend to use them to renovate the 1810 Mayfair property, as required by paragraph 2 of the construction agreement, the bank effectively, "waived its right to assert under 11 U.S.C. § 523(a)(6) that its claim is non-dischargeable and that it suffered 'willful and malicious' injury by... [the defendant]." <u>Wolfson v. Equine Capital Corporation (In re Wolfson)</u>, 56 F.3d 52, 55 (11th Cir. 1995) (parenthetical added).

Finally, the facts that are inconsistent with the bank's section 523(a)(2)(A) fraudulent intent claim likewise contraindicate a finding of the "intent to injure" necessary to establish a section 523(a)(6) claim for the same reasons already expressed. Those would include that: (1) the defendant's use of 1810 Mayfair loan proceeds to make payments on the construction loans he owed to the bank and to perform work on properties which the bank held a security interest in; (2) the defendant's use of the 1810 Mayfair loan proceeds and a substantial amount of his personal funds in the operation of his business which, had it continued to be successful, would have benefitted the bank; and (3) the defendant made all of his payments on the 1810 Mayfair loan and his other two personal construction loans before the draws on the former were stopped and, in addition, made two additional payments on the Mayfair loan after the draws had been stopped, as well as payments on his other two personal construction loans with the bank through December 2006.

16

## C. 523(a)(4) Embezzlement

The bank also contends that the debt resulting from the draws taken by the defendant on May 31, 2006; June 5, 2006; June 9, 2006; June 16, 2006; June 23, 2006; and July 14, 2006 are nondischargeable pursuant to 11 U.S.C. § 523(a)(4), which makes nondischargeable a debt, "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." In its post-trial brief, the bank clarified its claim by admitting that the defendant was not a fiduciary with respect to either the bank or the construction loan. It insists, however, that the defendant's actions in using the loan proceeds in a manner not authorized by paragraph 2 of the construction agreement constituted "embezzlement."

For purposes of section 523(a)(4), embezzlement is the fraudulent appropriation of property of another by a person to whom such property has been entrusted or into whose hands it has lawfully come. Reshetar Systems, Inc. v. Thompson (In re Thompson), 686 F.3d 940, 946-947 (8th Cir. 2012); Arvest Mortgage Co. v. Nail (In re Nail), 680 F.3d 1036, 1042 (8th Cir. 2012); Sherman v. Potapov In re Sherman), 603 F.3d 11, 13 (1st Cir. 2010); Miller v. J.D. Abrams Inc. (In re Miller), 156 F.3d 598, 602-603 (5th Cir. 1998); Brady v McAllister (In re Brady), 101 F.3d 1165, 1172-1173 (6th Cir. 1996); Transamerica Commercial Fin. Corp. v. Littleton (In re Littleton), 942 F.2d 551, 555-556 (9th Cir. 1991).

Proof that the appropriation was accompanied by fraudulent intent is required for a determination of nondischargeability pursuant to 523(a)(4) based on embezzlement. Bullock v. BankChampaign, N.A., ___ U.S. ___, 133 S.Ct. 1754, 1760 (U.S. 2013). "To meet the definition of 'embezzlement,' there must be proof of the debtor's fraudulent intent in taking the property." Miller v. J.D. Abrams Inc. (In re Miller), 156 F.3d 598, 602-603 (5th Cir. 1998). "[T]o amount to embezzlement, conversion must be committed by a perpetrator with fraudulent intent...." Sherman v. Potapov (In re Sherman), 603 F.3d 11, 13 (1st Cir. 2010).

Another essential element of embezzlement is that the defendant must have used the property entrusted to him in a manner other than the use for which it was entrusted or intended. " 'A creditor proves embezzlement by showing that he entrusted his property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud.' " Board of Trustees of the Ohio Carpenters' Pension Fund on Behalf of the Ohio Carpenters' Pension Fund v. Bucci (In re Bucci), 493 F.3d 635, 644 (6th Cir. 2007)(quoting Brady v. McAllister (In re Brady), 101 F.3d 1165, 1173 (6th Cir.1996)). "Embezzlement, thus, requires three elements: '(1) property rightfully in the possession of a nonowner; (2) nonowner's appropriation of the property to a use other than which [it] was entrusted; and (3) circumstances indicating fraud.' " Transamerica Commercial Fin. Corp. v. Littleton (In re Littleton), 942 F.2d 551, 555 (9th 1991)(quoting In re Hoffman, 70 B.R. 155, 162 (Bankr. W.D. Ark. 1986)). "A plaintiff must establish that the debtor was not lawfully

17

entitled to use the funds for the purposes for which they were in fact used." Belfry v. Cardozo (In re Belfry), 862 F.2d 661, 662 (8th Cir. 1988).

The bank's contention is that paragraph 2 of the construction agreement provided the necessary restriction on the defendant's use of the loan proceeds and that his use of them in a manner not authorized by that provision constituted embezzlement. However, as indicated above, the evidence indicates that it is more probable than not, or at least equally likely, with respect to the draws in question, that the bank expanded the permitted use of the funds received by the defendant by granting those draws, and not denying the same, after being specifically informed by the defendant that he fully intended to use those funds in a manner that would not comply with paragraph 2.

Furthermore, again, the facts that are inconsistent with fraudulent intent on the defendant's part with respect to the bank's section 523(a)(2)(A) claim likewise contraindicate, for the same reasons already expressed, a finding of the fraudulent intent necessary to establish that the defendant was guilty of section 523(a)(4) embezzlement. Those would include: (1) the defendant's use of 1810 Mayfair loan proceeds to make payments on the construction loans he owed to the bank and to perform work on properties which the bank held a security interest in; (2) the defendant's use of the 1810 Mayfair loan proceeds and a substantial amount of his personal funds in the operation of his business which, had it continued to be successful, would have benefitted the bank; and (3) the fact that the defendant made all of his payments on the 1810 Mayfair loan and his other two personal construction loans before the draws on the former were stopped and, in addition, two additional payments on the 1810 Mayfair loan after the draws had been stopped, as well as payments on his other two personal construction loans with the bank through December 2006.

### III. Conclusion

Based on the above, the Court concludes that the bank's claim that the debt owed to it by the defendant is nondischargeable by virtue of 11 U.S.C. § 523(a)(2)(A), 11 U.S.C. § 523(a)(4), or 11 U.S.C. § 523(a)(6), is due to be denied. In contrast, the Court concludes that the debt owed by the defendant to the bank is dischargeable and was, therefore, discharged by virtue of the Order Discharging Debtor entered on June 5, 2009 in Bankruptcy Case No.: 07-01571-BGC-7 pursuant to 11 U.S.C. § 727(a).

A separate order will be entered in conformity with this memorandum opinion.

Dated: March 6, 2014  /s/Benjamin Cohen
BENJAMIN COHEN
United States Bankruptcy Judge

BC:sm